1 PAUL B. SNYDER
United States Bankruptcy Judge
2 1717 Pacific Ave, Suite 2209
Tacoma, WA 98402

3

```
  ✓  FILED
____ LODGED
____ RECEIVED
```

**January 13, 2010**

MARK L. HATCHER
CLERK U.S. BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
_____DEPUTY

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF WASHINGTON AT TACOMA**

| | |
|---|---|
| In re: | Case No. 09-44002 |
| THURSTON HIGHLAND ASSOCIATES, LLC, | **MEMORANDUM DECISION** |
| Debtor. | ** **NOT FOR PUBLICATION** |

THIS MATTER came before the Court on December 7 and 8, 2009, on the motion of Thurston Highland Associates, LLC, (Debtor) for approval of a loan commitment and authority to borrow money, pursuant to 11 U.S.C. § 364[1], and on the motion of DDD Washington, LLC (DDD) seeking relief from stay pursuant to § 362. Objections were filed to both motions. At the conclusion of the evidentiary hearing, the Court took the matter under advisement. This Memorandum Decision shall constitute Findings of Fact and Conclusions of Law as required by Fed. R. Bankr. P. 7052. This is a core proceeding under 28 U.S.C. § 157(b)(2).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Debtor is a Washington limited liability company, which owns approximately 1,250 acres of undeveloped real property located in Yelm, Thurston County, Washington (Property). Steven Chamberlain (Chamberlain) is the manager and indirectly owns 51% of the equity interests in the Debtor through Tahoma Highlands LLC (Tahoma). In 2005, Tahoma purchased a 25% membership

---

[1]Unless otherwise indicated, all "Code," Chapter and Section references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101-1532.

MEMORANDUM DECISION - 1

interest in the Debtor from Dr. Paul B. Liao for $6,250,000.  In 2006, Tahoma purchased another 26% membership interest in the Debtor from Dr. Liao for $6,922,500.  To date, Tahoma has paid more than $10,865,000 to Liao in connection with purchasing memberships in the Debtor.  At the present time, Tahoma owns a 51% interest in the Debtor, Dr. Liao owns a 29% interest, and his son, Darwin Liao, owns a 20% interest.

Since 2005, the Debtor has worked to obtain the entitlements necessary to develop the Property.  It has obtained an approved environmental impact statement and preliminary approval for a 1,250 acre master planned community (MPC).  The MPC consists of 5,000 single and multi-family units, 40 acres of mixed-used commercial, 150 acres of recreational opportunities and open space including a regional sports complex, and 20 acres devoted to public use.  A significant portion of the development costs incurred to date were funded from a loan made by Frontier Bank.  The original loan was taken out on November 10, 2005, in the amount of $7,400,000, secured by a deed of trust on the Property.  On June 18, 2007, the principal amount of the loan was increased to $12,000,000.  The deed of trust was modified to reflect the increased loan amount.  On July 5, 2008, the loan was extended, the principal was fixed at $11,999,999.91 and the interest rate was lowered to 7%.  The loan matured in September, 2008, and went into default.  Frontier Bank subsequently commenced a non-judicial foreclosure process with respect to the Property.  While the foreclosure proceeding was pending, DDD, an entity formed in May 2009 by the Liao family, purchased the Frontier Bank loan. DDD's foreclosure sale was scheduled for June 5, 2009.  On June 4, 2009, the Debtor commenced this bankruptcy case.

There are four secured interests against the Property: (1) unpaid real property taxes of approximately $66,000, (2) the DDD Obligation of approximately $13,000,000, (3) a LID assessment for road improvements in the amount of $4,888,000 payable over a 15 year period, and (4) a materialman's lien of approximately $154,000.

The Debtor has entered into a Loan Commitment with Sammy Woonha Lee (Lee).  Pursuant to the Loan Commitment, the Debtor intends to borrow $3,000,000 for a one year period.  The loan

MEMORANDUM DECISION - 2

proceeds will be used to pay interest on the existing Frontier Bank loan (DDD Obligation) in the amount of $70,000 per month, and pay the expenses necessary to obtain final approval for the first 1,000 lots in the Debtor's 1,250 acre MPC and preliminary plat approval for development of the first 300 lots. Additionally, over the one year life of the loan, the following expenses not related to the development of the Property shall be paid: $412,500 to Lee for interest payments; $300,000 facilitator fee; legal fees of $76,000; real property taxes of $96,964; and $250,000 for project administrative/management. Thereafter, the Debtor intends to refinance or sell the Property for an amount sufficient to pay all creditors in full. The Loan Commitment requires that Lee be granted a first position security interest in the Property thereby priming the lien securing the DDD Obligation. The Debtor has indicated that it would be able to effectively reorganize whether or not it's Motion for Approval of Loan Commitment and Authority to Borrow Money is approved.

DDD's Motion for Relief from Stay is based on its position that there is no equity in the Property. At the hearing four expert witnesses testified as to the Property having a value ranging from $9,250,000 to $41,000,000. The Debtor listed the Property in its bankruptcy schedules as worth $65,000,000. The DDD Obligation is approximately $13,000,000. DDD alleges the Property is worth $9,250,000, which is less than the amount of its secured loan. The Debtor asserts that there is sufficient equity in the Property as its value is between $32,000,000 and $41,000,000.

In determining whether DDD should be accorded relief from stay, an important inquiry is the value of the Property so as to determine whether a sufficient equity cushion exists to form a basis for adequate protection for a finite period of time. In this regard, the Court has reviewed the testimony and evidence presented.

An initial problem that the Court must confront is the substantial disparity in the four appraisals admitted into evidence, with values of the Property ranging from $8,500,000 to $41,000,000. The primary difference as to how the Property was ultimately valued concerns the availability of water rights to serve the proposed development. The evidence indicates that as of the date of the hearing the Debtor does not have perfected or secured water rights. Although it purchased an adjacent golf

course, in part, to obtain water rights for $4,000,000, these water rights will be transferred to the City of Yelm. In turn, the City of Yelm must obtain approval of the Washington State Department of Ecology to grant these rights to the Debtor. This has not been done as only $1,000,000 has been paid by the Debtor to the seller of the water rights, and testimony indicates that an additional $1,000,000 must be paid prior to the Debtor having authority to transfer the golf course water rights to the City of Yelm. Assuming that this money is paid, although there is no provision for this payment from the proposed borrowing, the evidence was inconclusive as to whether the Debtor could reserve these golf course water rights to be transferred to Yelm, for the initial 300 unit phase of the Property development.

The Appraisal Review prepared for the Debtor by Brian O'Connor, MAI (O'Connor Review Appraisal) appraised the Property at between $32,450,000 and $33,540,000. This was based on a review of the appraisal prepared for DDD by Richard Briscoe and Stan Sidor of GVA Kidder Mathews (Kidder Appraisal). Mr. O'Connor did not independently review the data prepared in the Kidder Appraisal, but assumed it to be substantially correct, except for the risks associated with the availability of water rights. The Kidder Appraisal valued the Property at $37,500,000, reduced this figure by estimated expenses necessary to complete a water system for the golf course water rights, an EIS processing fee for the City of Yelm and the LID assessment, and added back in profit and valued the property at $33,490,500. From this figure a 65% reduction was made for the lack of secured water rights. O'Connor disagrees primarily with the substantial discount for the lack of water rights, which accounts for the substantial difference between these two appraisals.

The Debtor also bases equity on an appraisal by Jeffrey Sherwood, who updated his original appraisal dated November 18, 2008. The original appraisal valued the Property at $100,000,000. The reduction to $41,570,000 was based primarily on eroding market conditions and assumed that like many large projects, the water supply issue would be ultimately resolved.

Lastly, the Wilson Appraisal submitted on behalf of DDD and prepared for the City of Yelm, valued the Property at between $8,500,000 and $14,750,000. The low appraisal was based on the assumption that the current value of the lots was less than what it would cost to develop them. Mr.

MEMORANDUM DECISION - 4

Tate of Wilson Appraisal Services, LLC, testified that partially completed subdivisions are less expensive to buy than raw land to develop. He recognized that appraising large tracts of undeveloped real estate in this climate is more art than science.

It is disturbing to have such a large discrepancy as to the value of the Property from qualified and credentialed expert witnesses. The most credible evidence, however, would indicate that the Property value, not considering a discount due to possible issues concerning the availability of water rights, is at least $30,000,000. The Debtor's appraisals ranged in value between $32,450,000 and $41,750,000. Even the Kidder Appraisal, prepared for DDD, recognized that the value of the Property, without taking into consideration the water rights issue, was over $33,000,000 after making reductions for necessary fees and expenses. Although water rights are clearly an issue, DDD's expert witness presented no credible evidence for a reduction in value of nearly 65%. Stan Sidor testified that he had little or no prior experience discounting a proposed MPC for possible lack of current water rights, and there was not sufficient evidence presented to support his proposed large reduction. In addition, credible testimony was provided that the water rights issue is actively being pursued and that $1,000,000 has already been paid to the golf course to secure additional water rights for the City of Yelm. Even the Wilson Appraisal's Mr. Tate testified that it was his opinion that generally water rights will be available as needed, although such rights may take additional time to secure.

The Court concludes that a preponderance of the evidence indicates that the Property has a value of approximately $30,000,000, subject to a discount due to the time and cost it would take a developer to secure water rights. Evidence indicates that the discount for water rights is less than the 65% testified to by Mr. Sidor. As the DDD Obligation is approximately $13,000,000, even after taking into consideration other liens on the Property, and a discount for issues concerning water rights, a sufficient equity cushion exists to adequately protect DDD for a period of time. The Court concludes, that relief from the automatic stay is currently not warranted under § 362(d), and the motion is continued as set forth below.

The Debtor seeks approval of its borrowing request pursuant to § 364. There are two requirements to borrow money secured by a senior lien on property of the estate: (1) the inability to obtain credit on better terms, and (2) adequate protection of the secured interests of existing creditors. It appears undisputed that the Debtor has not been able to obtain credit on better terms than set forth in the Loan Commitment; however, the parties dispute whether adequate protection has been established. The burden of proof in establishing adequate protection lies with the Debtor. § 364(d)(2).

Although the adequacy of the equity cushion is an important inquiry in evaluating the Debtor's request to borrow money pursuant to § 364(d), a finding that sufficient equity exists to deny relief from stay does not necessarily mean that the motion to borrow should be granted. The § 364(d) process, which allows a debtor in possession to "prime" an existing lien is "considered rare and extraordinary, which is why 'the trustee or debtor in possession must establish an inability to obtain the necessary credit by any method other than having such credit secured by a senior or equal lien on previously encumbered property.'" Bland v. Farmworker Creditors, 308 B.R. 109 (S.D. Ga. 2009) (quoting 2 Norton Bankruptcy Law and Practice 2d § 38:7 (Sep. 2003)).

In this case, although it appears undisputed that the Debtor has made efforts to obtain a loan on more favorable terms, the terms of the proposed loan are onerous. Even though some equity may currently exist in the Property, the Debtor needs to establish that the terms are commercially reasonable given the Debtor's financial circumstances, and that the use of the loan proceeds will enhance the value of the Property. The evidence indicates that the lien of DDD will be primed by the requested $3,000,000 loan, but over the 11 month period, DDD will receive an interest payment of $770,000 ($70,000 per month for 11 months), and a payment of almost $100,000 to cover real property taxes. Deducting the facilitator fee of $300,000, and interest payments to Lee of $412,500, less than one-half of the loan principal will be available to fund actual project costs. The Debtor admits that it has no current funds available to develop the Property and appears to be relying on the $3,000,000 borrowing to get the project to a point that it will either entice take out lending or further

funding. No credible evidence was presented, however, to support the Debtor's intentions, which would be difficult to achieve in a normal market, let alone in today's climate of conservative lending. The evidence presented was not persuasive as to how the remaining loan proceeds would make the project more marketable or enhance its value. Particularly, as none of the proceeds will be used to secure water rights. Further, assuming arguendo that the remaining $1,000,000 payment will be made, it is still not clear that the golf course water rights will inure to the benefit of the Debtor. This is particularly true as it was recognized that there are a number of large residential development projects in the area that are also possibly in need of water rights. Based on the above and despite the fact that equity may currently exist, the Court concludes that the Debtor has failed to establish that its motion to borrow should be approved under the proposed terms, and this motion is denied without prejudice.

In summary, the Court concludes that the Debtor's motion to borrow money is denied, without prejudice. DDD's motion for relief from stay is continued to March 18, 2010, at 10:30 a.m. A hearing on confirmation of the Debtor's plan of reorganization and the adequacy of the disclosure statement should also be set for the above date and time. At this hearing, the Debtor must establish with evidentiary support that it has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable period of time.

DATED:       January 13, 2010

___*Paul B. Snyder*_____
Paul B. Snyder
U.S. Bankruptcy Judge

MEMORANDUM DECISION - 7